*McDonald & McDonald - ERISA Disability Attorneys*
*Let Our Family Fight For Your Family! ®*
*www.McDonaldAndMcDonald.com*

June 8, 2017

Unum
Benefits Center
Appeals Unit
PO Box 9548
Portland, ME  04104-5058

|  | RE: | My client: | Michele H. Weinberg |
|--|-----|-----------|---------------------|
|  |  | Claim No: | 12326473 |
|  |  | Policy No: | 404969 |

Dear Representative:

This office represents Michele H. Weinberg in her claim for long-term disability benefits. Unum denied Ms. Weinberg access to those benefits by correspondence dated December 15, 2016. The denial letter provided Ms. Weinberg with the ability to appeal this errant decision. Ms. Weinberg has hired us as her representative and the attached documents constitute our appeal. We request that these documents be placed in the administrative record in the order that they are received by Unum.

After examining the contents of our appeal, we believe that Unum will be compelled to start paying Ms. Weinberg the long-term disability benefits that have been withheld from her.

**Policy Language**

Unum insures a policyholder identified as Solil Management, LLC. The Unum policy is delivered in New York and the governing jurisdiction is noted to be New York.

The policy covers two classes of employees. The first class are those individuals making less than $75,000.00 a year. The second class is individuals making $75,000.00 a year or more. Ms. Weinberg falls into the latter class as her salary is well above $75,000.00 a year.

As such, Ms. Weinberg's definition of disability only embraces the performance of her own occupation. Specifically, disability is defined as,

"You are disabled when Unum determines that: 1) you are limited from performing the material and substantial duties of your Regular Occupation due to your Sickness and Injury; and 2) you have a 20% or more loss in Indexed Monthly Earnings due to the same Sickness or Injury."

200 E. Spring Valley Rd, Suite A
Dayton, Ohio 45458

Ph 937-428-9800
Fax 937-428-9811
Toll Free 877-428-9806

Joe McDonald, Esq
Christy McDonald, Esq

EXHIBIT A

The maximum monthly payment under Unum's contract is $10,000.00 per month and the policy indicates quite clearly that deductible sources of income would include payments made under the Social Security Act.

Other notable provisions indicate that Ms. Weinberg would be eligible for Unum benefits up through her Regular Retirement Age, which is noted to be 67 years old.

The Glossary of Definitions also provides the following useful definitions:

- "Indexed Monthly Earnings" for an individual making $75,000.00 or more annually is defined as, "...means your monthly earnings adjusted on each anniversary of benefit payments by the lessor of 10% or the current annual percentage increase in the Consumer Price Index.  Your Indexed Monthly Earnings might increase or remain the same but will never decrease.  The Consumer Price Index (CPI-U) is published by the US Department of Labor. Unum reserves the right to use some other similar measurement if the Department of Labor changes or stops publishing the CPI-U.  Indexing is only used as a factor in the determination of the percentage of loss earnings while you are disabled and working."
- "Material and Substantial Duties" is defined as, "Duties that are normally required for the performance of your Regular Occupation and cannot be reasonably omitted or modified."
- "Regular Occupation" means, "the occupation that you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."

The policy also defines in its Schedule of Insurance that employees must be working 30 hours a week to be eligible for the coverage and that the Elimination Period is 180 days.[1]

## Benefit Calculations

According to Unum's file, Ms. Weinberg presently has a salary of $165,405.96 per annum.  Her monthly salary is $13,783.83.  According to the Unum contract, the amount of benefits per month equal $8,270.29 per month, which is 60% of her monthly earnings.

Ms. Weinberg has won her Social Security case and was awarded disability benefits on application.  According to the Notice of Award, she was found disabled as of May 5, 2016 (her

---

[1] Unum does not provide coverage under this Plan for short-term disability. The employees of Solil have access to a company funded sick leave and also are eligible for New York State DBL benefits pursuant to New York law.

last day of actual work). She is eligible for $2,607.00 per month beginning in _____. Ms. Weinberg's monthly payment from Unum is reduced to $5,663.29. Ms. Weinberg does not have any dependents and has not received any other offsets which would reduce Unum's responsibility to her.

Presently, Ms. Weinberg is owed long-term disability benefits from November 4, 2016 to the current day, (June 4, 2017). This means that 8 months of benefits have not been paid. Therefore, the missing benefits owed to Ms. Weinberg are presently equal to $45,306.38. As Unum reviews her long-term disability appeal, the amount of past due benefits will increase.

## Occupational Demands

According to Unum's file, Ms. Weinberg performed the job of Residential Leasing Agent which had a job description that itemized that Ms. Weinberg was responsible for day to day operations of the leasing management for the entire residential portfolio consisting of approximately 4500 apartment units; oversee policies, procedures, and execution of all new and renewal leases; review all apartment applications for approval and credit evaluation; and manage and update vacancy lists several times a day.

The occupation, according to Unum, is identified in the DOT as 250.357-014, Leasing Agent, Residence. The DOT indicates that the strength demands are light and that the job is skilled, noting an SVP of 5.

While Ms. Weinberg reports that she sat more than she walked, nonetheless, the Unum policy refers to occupation, not job.

The Unum claim file indicates that Unum professionals conducted a vocational assessment and determined, on November 17, 2016, that Ms. Weinberg's occupation is best referenced as Residential Leasing Agent, DOT 250.357-014. Unum noted that the physical demands would be at the light demand level but notes that the job had frequent sitting, frequent reaching, occasional walking, occasional standing and occasional climbing.

Unum also asked a different vocational professional to identify whether or not the occupation had any mental or cognitive demands and the same vocational employee, Angela Saucier-Tugman, indicated that the work performed in the occupation would be skilled work noting that there is a necessity to make judgments and decisions, solve problems and perform a variety of duties without loss of efficiency. She also described that the occupation requires effective communication with others and relevant duties would also include accepting responsibility for formulating, implementing, controlling and directing activities of others.

3

Thus, it can be determined that the work is both light and sedentary and that the work is skilled and that its skilled nature is supported by the income which is paid to Ms. Weinberg for the successful performance of the occupation. Ms. Weinberg has been performing this occupation since June 15, 1981, when she accepted her employment with Solil Management, Inc.

## Unum's Medical Evidence Prior to Denial

At all points in time, Unum retained the ability to examine Ms. Weinberg and it elected not to do so. Unum relied exclusively on medical opinions that were generated by its employees and/or vendors closely associated with Unum. Initially, the case was analyzed on November 15, 2016 by Steven Kirsch, M.D. Dr. Kirsch reviewed the medical records and concluded the following,

> "Treatment intensity has included low dose non-steroidal anti-inflammatories, 'spare' use of Percocet, home exercise program and acupuncture. She has noted no improvement with epidural steroid injections. On physical exam, her motor sensory and deep tendon reflexes are noted to be normal. Her straight leg raise testing is negative bilaterally. She is noted to have pain with range of motion in the spine. She was noted to have abnormal x-ray findings from July 2015, yet she was able to continue to perform her occupation. Based upon a preliminary review of the medical records, the medical record fails to support the claimant is currently precluded from the demands as listed by vocational resource on a full-time sustained basis."

Dr. Kirsch planned to speak with Ms. Weinberg's physical medicine physician, Dr. Kim, before concluding his commentary.

Dr. Kirsch sent Dr. Kim a letter dated November 21, 2016, and asked Dr. Kim to agree with him concerning Ms. Weinberg's capability to perform the physical demands of her occupation from November 3, 2016 and ongoing. Dr. Kim refused to agree with Dr. Kirsch's assessment. Indeed, claimant's prior counsel strongly objected to Dr. Kirsch and advised Unum of Dr. Kirsch's lack of appropriate qualifications and dubious history in other cases. Unum accepted the criticism and completed an alternate work up. On December 1, 2016, Tracy Hamill, M.D., a family medicine physician and medical consultant to the Unum Insurance Company, completed a file review of the case. Dr. Hamill concluded that restrictions and limitations were not supported. Among Dr. Hamill's more alarming conclusions, is the following:

4

> "There are noted degenerative changes on providing imaging studies that could potentially impact pain and muscle function. However, provided electrodiagnostic testing and persistent and normal muscle and reflex testing indicate that noted stenosis on imaging is not impacting cord or nerve function."

Further alarming statements from family physician Hamill include:

> "Physical exam findings of decreased range of motion secondary to pain or positive facet loading signs are consistent with degenerative changes noted on imaging. However, given otherwise normal/negative exam findings available medical information would not preclude performance of frequent sitting with occasional exertion up to 20 lbs."

Dr. Hamill shows us her exacting understanding of vocational science in the following paragraph,

> "Provided restrictions/limitations from PM&R provider of no sitting, standing, or walking for greater than 1 hour at a time are medically reasonable. Indicated lifting restrictions of no greater than 20 lbs. is also medically reasonable given claimant age, gender, reports of pain symptoms and noted degenerative changes on imaging. However, given noted capacity for change of position throughout the work day (occ. ID dated 11-17-16) these restrictions/limitations appear consistent with claimant's performance of her identified own occupational demands on a full-time basis."

Finally, Dr. Hamill is motivated to do damage to Ms. Weinberg by drawing upon things that she does not understand and removing the context. Dr. Hamill states,

> "As a whole, the available medical record does not support that any medical condition, or combination of conditions, would preclude claimant's performance of her identified own occupational demands after follow up with PM&R on 11-3-16 and ongoing. Claimant's reported activities *including driving and grocery shopping, reported medication usage and ongoing intensity of care would support that pain symptoms would not rise to the level in which they would prevent the performance of this level of functional activity*." (Emphasis added)

Thus, Dr. Hamill strays outside of her expertise and diminishes the pain and uses comments taken out of context to create a false sense of Ms. Weinberg's highly skilled job as well as her sustained capability for work. Because there was disagreement between Dr. Hamill

5

and Ms. Weinberg's treating physician, Dr. Kim, Unum protocol directed that the case be sent to Suzanne Benson, M.D., who is a physical medicine and rehabilitation physician who works for Unum in Chattanooga, Tennessee at its headquarters.

It is no surprise that Dr. Benson concurs with Dr. Hamill and in doing so, shows that she has a profound misunderstanding of what a pain generator is. In her assessment, she states,

> "2015 imaging reported spondylosis and grade I L4-5 and L5-S1 degenerative spondylothesis. There was no significant central canal or neural foraminal narrowing at *most levels*. L4-5 findings included **moderate to severe central canal stenosis and mild to moderate neural foraminal narrowing.** There was no instability on flexion and extension views at L4-5, there was minimal change on flexion at L5-S1."

Finally, Dr. Benson offers this comment,

> "The claimant reported chronic low back pain and bilateral lower limb pain. Lumbar spinal stenosis was supported by 2015 imaging when the claimant continued unrestricted work. Weakness resolved based on AP examinations. electrodiagnostic testing was negative. Recent AP examinations noted pain with spine range of motion and positive lumbar facet loading while gait without assistive device, was non-antalgic. Straight leg raise test were negative and strength and light touch sensation were intact. Activity is recommended in treatment for chronic pain unless there is a structural issue that precludes it. In this case, the AP was aware of all available spine imaging findings in 2015 and did not recommend work stoppage in 2015."

These opinions manifest a profound misunderstanding of the clinical evidence that was generated in the case and are dismissive of the one individual who has examined Ms. Weinberg over a multi-year period.

A close examination of the Unum policy does not indicate that your pathology must be at more than one level or that it must produce positive EMG studies demonstrative of radiculopathy or that straight leg raising is a standard by which disability is provided.

As we shall see, Ms. Weinberg's medical records prior to Unum's denial of her benefits are full of objective and clinical findings which would cause any reasonable person to doubt the conclusions offered by Unum contrary to disability.

It is also noteworthy that throughout the medical record, Unum was satisfied that Ms. Weinberg was disabled through the entire Elimination Period. The clinical work done by Unum's physicians and Unum's own claim representatives demonstrates a belief that Ms. Weinberg might get "better" by the end of the Elimination Period. Regrettably, she did not. Ms. Weinberg's denial letter does not suggest that she was not disabled during the Elimination Period and therefore, Unum, through its acts, words and communications cannot now dispute Ms. Weinberg's ongoing disability up to the time that Unum denied her continued access to benefits beyond November 3, 2016.

## Ms. Weinberg's Medical Records

Ms. Weinberg has been a patient of the Murry Hill Medical Group for several years and she has clearly had some back pain and difficulty in her lumbar spine from the medical records that Unum has in its possession.

Prior to her departure from work, Ms. Weinberg had an x-ray of the lumbar spine on April 22, 2015, which showed, "Exaggerated lumbar lordosis with Baastrup's disease. Lumbar spondylosis with small anterolisthesis of L4 on 5, L5 on S1 which minimally changes stable on maneuvers on flexion. Lower lumbar apophyseal joint arthrosis."

Three months later, Ms. Weinberg did have an MRI of the lumbar spine on July 24, 2015. That MRI noted pathology at multiple levels. The history taken by the radiologist notes as follows: "55 year old female presenting with chronic low back and bilateral leg pain. Clinical concern for lumbar stenosis. MRI requested for further evaluation."

On examination of the spine from T10 through L4, does not show more than mild disc bulging. At L4-5, findings are noted as follows:

> "Grade I anterolisthesis with uncovering of the disc, circumferential disc bulge with superimposed right foraminal/extraforaminal protrusion and moderate bilateral facet arthropathy with hypertrophy of the ligamentum flavum result in mild/moderate right and mild left neuroforaminal narrowing with *contact* of the exiting nerve roots. *Moderate to severe canal stenosis.*"

L5-S1 findings were reported as follows:

> "Grade I anterolisthesis with uncovering of the disc, circumferential disc bulge and mild to moderate bilateral facet arthropathy. There is no significant neural foraminal or canal stenosis."

7

Ms. Weinberg saw Dr. Hui Chon Kim, M.D., on July 20, 2015. On that day, she gave the following history, "Ms. Weinberg presents with a history of lower back pain X years, but more notable over the past 1-2 years, now affecting her limbs." Dr. Kim assessed the condition as follows:

> "Ms. Weinberg presents with chronic lower back pain with more persistent radicular features of late. Concern is for sensation of buckling with focal weakness on exam. Pathology and potential treatment options discussed. recommend further work up with advanced imaging first, consider conservative measures with PT vs. injections."

On August 31, 2015, Ms. Weinberg again appeared before Dr. Kim and noted, "The acute onset of mid-back pain while sitting this morning, felt sharp pain along the thoracic spine felt this radiated proximally and around the rib cage." Dr. Kim assessed, "Ms. Weinberg presents with chronic lower back pain secondary to lumbar stenosis-pathology and potential treatment options discussed. Recommend trial of conservative measure with PT and meds as prescribed." At that time, Dr. Kim provided Skelaxin and Meloxicam to help Ms. Weinberg deal with her pain.

On September 2, 2015, an EMG was performed which was within normal limits.

In 2016, Ms. Weinberg saw Dr. Kim on February 3, 2016, with an increase in clinical severity. The medical history indicates,

> "Notes ongoing lower back pain, now affecting work, finds it difficult to physically get to work, and once there, increased pain with sitting for 8 hour work days.
>
> Describes ongoing lower back pain, constant pain, 9/10 at its worst, This is radiating down bilateral legs, L>R, down to the left foot, + electric shock like in sensation causing her to almost trip, ? paresthesias, using meds without relief.
>
> Currently in PT without significant relief."

Dr. Kim assessed, "Ms. Weinberg presents with persistent lower back and leg pain, known lumbar stenosis. Discussed pathology and treatment options – will consider potential lesi (lumbar epidural steroid injection) for pain management – Continue PT, HEP." Medications of Metaxalone, Ibuprofen and Levothyroxine and Skelaxin were provided.

On March 3, 2016, Ms. Weinberg reported to Joseph DeVito, M.D., of the Murray Hill Medical Group, that,

> "Her back symptoms have been getting worse recently. Feels significant restriction of motion, has not been able to exercise back. Denies history of trauma, falls, or mva. She has had ongoing difficulty with sitting, filing, and walking which are all part of her work in a real estate company; symptoms and problem are not a result of any work related injury. She has missed work intermittently and has difficulty concentrating at work. Back pain can awaken her from sleep and is often associated with radiating pain into both legs, feet and toes bilaterally and despite weekly physical therapy still have difficulty walking more than one city block or climbing more than one flight of stairs. She is unable to lift anything, carry or bend down to pick up floor objects. She is also unable to sit for more than 15 to 20 minutes at a time due to shooting pain in lower back and both legs."

The physical exam on that day notes generalized weakness throughout the upper and lower extremities. Medication lists were reassessed to include Metaxalone, Ibuprofen and Skelaxin for pain.

Ms. Weinberg saw Dr. Kim again on May 12, 2016. At that point in time, she reported,

> "Presents to discuss worsening pain over the past several months – more frequent shocks of pain down bilateral thighs, into the lateral calves, + sensitivity to touch. More frequent spasms of pain across the lumbar spine, constant soreness along the lumbar spine.
>
> Unable to sit, transition sit to stand, + prolonged standing, walking. Sleep is now affected, difficult to get into a comfortable position."

Examination by Dr. Kim noted positive right and left facet loading in Ms. Weinberg. Dr. Kim further reconsidered adding lumbar epidural steroid injections and pain meds as needed.

On May 26, 2016, Dr. Kim saw Michele Weinberg again and at that point in time, Ms. Weinberg,

> "Continues with lower back pain, trial of prn pain meds without any relief. Will proceed with LESI next Wednesday with Dr. Penta.
>
> Describes ongoing lower back pain, with radiation into bilateral lower

extremities, + shock like pain down the posterior thighs bilaterally, from the
buttocks, into the calves.  Symptoms are constant, but made worse with
prolonged sitting.  Using ibuprofen prn.

Has been unable to return to work since 5/5/2016."

Examination by Dr. Kim noted positive Faber's test and positive internal hip rotation which
elicited pain.

An x-ray of the hip was completed on May 27, 2016, which noted, "There are
degenerative changes also noted in the visualized lower lumbar spine.  There are degenerative
changes in the pubic symphysis."  Special pathology was noted regarding the hips including a
"mild narrowing of both hip joints especially noted medially with significant osteophyte
formation about both hips compatible with osteoarthrosis of both hips."

Ms. Weinberg appeared for fluoroscopic injection on June 15, 2016.

Ms. Weinberg saw Dr. Kim again on July 7, 2016, where it was noted that,

"Still notes persistent lower back pain, this is radiating down bilateral legs,
left > right currently, + difficulty getting comfortable at night to sleep.
standing, sitting, walking can be difficult, best lying with leg elevated.  No
paresthesias.  Using ibuprofen.  Remains out of work since 5/5/2016."

On physical exam, Dr. Kim noted negative straight leg and negative facet loading after Ms.
Weinberg's first epidural steroid injection.  In her assessment, Dr. Kim writes,

"Ms. Weinberg presents with chronic lower back pain secondary to lumbar
stenosis – will proceed with trial of LESI.  Trial of Neurontin as directed –
potential side effects reviewed."

Dr. Kim saw Ms. Weinberg next on July 27, 2016, where it was noted,

"Symptoms remain about the same – tolerating Gabapentin at night but
unsure of any benefit at current dose.  *No improvement with initial LESI –*
will consider fu 2nd injections.  No new complaints."

In her assessment, Dr. Kim notes,

"Ms. Weinberg presents with chronic lower back pain, secondary to

lumbar stenosis with chronic radicular features.  Will titrate medications as tolerated.  Proceed with 2nd LESI as discussed."

Dr. Kim noted that Ms. Weinberg completed a second LESI on August 25, 2016.  She reported back to Dr. Kim on September 22, 2016, where she described,

> "s/p LESI #2 without notable change/improvement in symptoms.  Describes 7-8/10 pain across the lower back, into bilateral thighs, worse with walking, Standing. No tingling or weakness.
>
> Stopped Neurontin – gi upset.  Prn use of ibuprofen."

Dr. Kim assessed, "Ms. Weinberg presents with persistent lower back pain secondary to lumbar stenosis.  No response to protracted conservative measures.  Will consider trial of acupuncture.  Deferring surgical eval at this time."  Medications at that point included Norco, Acyclovir, Metaxalone and Ibuprofen for pain.

On November 3, 2016, Dr. Kim noted ongoing lower back and bilateral leg pain.  She describes symptoms are now at its worst, 8/10, across the lower back and down bilateral thighs. She describes the pain as sharp in quality and worse in the morning with continued sitting and walking.  Ms. Weinberg reported no paresthesias and that she has acupuncture coverage and will seek that treatment.  She reports using ibuprofen and Percocet sparingly. On clinical exam, Dr. Kim noted right and left positive facet loading and she assessed,

> "Ms. Weinberg presents with persistent ongoing lower back and leg pain secondary to lumbar stenosis, lumbar radiculopathy.  Will proceed with HEP, trial of acupuncture and meds as discussed."

On December 5, 2016, Dr. Kim saw Ms. Weinberg again and at that point in time reported that her chief complaint was, "lower back pain" and noted that her,

> "lower back pain is persistent, 7-8/10, with pain in the bilateral anterior thigh pain, 8/10, describes sharp in quality, worse with standing, sitting, walking – limited in walking, needs rest after 10 minutes.
>
> No paresthesias or weakness.
>
> Has started acupuncture, three sessions in.
>
> Continuing gabapentin 300 mg. BID

11

On physical exam, Dr. Kim noted that Ms. Weinberg was antalgic and that her lumbar extension was limited to 10 degrees with pain and that she had positive limitations in hip IR. Dr. Kim noted positive findings bilaterally on internal hip rotation and that right and left facet loading were both positive. Dr. Kim's assessment on that day indicated,

> "Ms. Weinberg presents with persistent lower back and leg pain secondary to lumbar stenosis. Bilateral hip DJD also contributing – will proceed with trial of targeted hip injection. Continue meds as directed. Remains totally disabled from work."

Ms. Weinberg had a hip injection and pain block on December 15, 2016. The procedure was completed by Norman Y. Schoenberg, M.D.

In 2017, Ms. Weinberg's complaints continued. Again, she reported to Dr. Kim on January 18, 2017. Her primary complaint was still lower back pain and that she was complaining of side effects from gabapentin with no relief in pain. Dr. Kim described to titrate Ms. Weinberg off the medication. Ms. Weinberg also reported no relief from the left hip block and also noted that she still has daily lower back pain; bilateral leg pain; numbness; worse with standing, walking > blocks; increased sensation of weakness, fatigue in the legs with any protracted walking.

Physical exam noted that Ms. Weinberg was limited in lumbar flexion and extension. Dr. Kim's assessment on that day included that Ms. Weinberg presented with chronic lower back pain, known lumbar stenosis with persistent pain and weakness.

At that point, Dr. Kim decided to obtain updated imaging for consideration of further treatment options.

On January 30, 2017, Ms. Weinberg underwent an MRI of the lumbar spine which was compared to the previous study in July 2015. The updated study noted new types of pathology in new places which certainly would be capable of generating pain in the lumbar spine.

The MRI, dated January 30, 2017, found that the disc at L2-3 could now be described as "disc protrusion with fissuring of the annulus fibrosis." Likewise, the disc at L3-4 was described the same way. At L4-5, the pathology continued and progressed from previous study. At L4-5, Ms. Weinberg demonstrated,

> "Grade I anterolisthesis. Broad-based disc osteophyte complex, asymmetric to the right lateral recess / right foraminal region, unchanged. Severe bilateral

> facet joint degenerative disc disease, unchanged. Findings produce
> moderate to severe spinal canal stenosis, unchanged. Moderate severe
> right and mild left neuroforaminal stenosis, slightly progressed on the right
> foramen."

At L5-S1, no significant progression was noted.

Nerve conduction studies that were done on February 17, 2017, indicate that nerve conduction studies were within normal limits but needle evaluation of the right and left muscles showed moderately increased spontaneous activity with diminished recruitment. This finding is abnormal.

Following the EMG study, Dr. Kim saw Ms. Weinberg again on April 5, 2017, where again the chief complaint was lower back pain and that Ms. Weinberg noted that she had ongoing lower back pain that was radiating into bilateral thighs. Dr. Kim noted that Ms. Weinberg had positive faber test, positive internal hip rotation and assessed Ms. Weinberg as follows:

> "Ms. Weinberg presents with persistent lower back and bilateral hip/leg
> pain- known lumbar stenosis, DJD hips. Will proceed with updated hip
> imaging given progressive hip tightness/decreased ROM."

Medications now included Percocet, Neurontin, Norco, Acyclovir and Metaxalone.

All of this clinical evidence has been misrepresented, underappreciated or otherwise ignored or repackaged by Unum's physicians. If Ms. Weinberg demonstrates anything, she demonstrates profound consistency. She demonstrates a continuous reporting of similar complaints which obviously became worse at or around the time that she left work. Ms. Weinberg's physicians are recording the history that she is providing and are noting a belief that she is consistent by their testing, note taking and authorizing lumbar epidural steroid injections and oral medications.

All of the objective and clinical evidence suggests the presence of an abnormal state of health. That is to say, that Ms. Weinberg has achieved a level of degeneration in her lumbar spine that generates a lot of pain that prevents her from doing the material and substantial duties of her skilled occupation.

**Appeal and Argument**

In order to clarify Dr. Kim's previous opinions and Ms. Weinberg's clinical history, it became necessary to take Dr. Kim's statement under oath. She was able to describe for Unum that she is presently engaged in the clinical practice of medicine for the Murray Hill Medical Group and that she specializes in physical medicine and rehabilitation. Dr. Kim does not conduct any Independent Medical Examinations and her practice is 100% clinical. Dr. Kim agreed that Ms. Weinberg does have pathology in her hips and her lumbar spine and described the mechanics of the pathology in both areas.

Dr. Kim reported that she had been familiar with Ms. Weinberg from 2015 to the present day and still recognizes her as a patient.

While Unum believes that there is great clinical significance in the fact that Ms. Weinberg's 2015 EMG was negative, Dr. Kim does not have a concern. The following exchange occurred between your undersigned and Dr. Kim:

Q:      Did that cause you any concern that, I mean, she's basically reporting some weakness and you are finding some weakness on exam, but the EMG says its normal.

A:      That can happen sometimes.

Q:      As a clinician, that didn't cause you to say, well, she's lying or anything like that?

A:      No, no, no.

Q:      And again, there's only one doctor on this conversation, it's you. So that doesn't bother you in terms of pain, weakness, but an EMG being normal?

A:      No.
(Tr. 13-14)

Dr. Kim was asked to look upon the MRI that was recently done in January 2017. Dr. Kim stated,

A:      I think the most important level, at L4-5 I do see some progression in that right foraminal narrowing at the L4-5 level.

Q:      And at that level she's rated at severe; isn't she?

14

A:        Correct.

Q:        And that's the same where she had the severe canal stenosis on the previous exam too.

A:        Correct.

Q:        She did note, too, at L2-3 and 3-4, there were disc protrusions with a fissuring of the annulus?

A:        Correct.

Q:        That's a new finding; isn't it?

A:        I'll double check, but I believe the fissuring – correct.

Q:        So it appears that there was a change in her medical or pathology severeity between the tests?

A:        Correct.

Q:        It does describe here discogenic, moderate discogenic degenerative disease. When we say the disease is discogenic, what does that mean?

A:        That means the disc in and of itself is worn. It's degenerative, it's desiccated. Fissuring means there's actually fissuring along the margins of the disc. That goes in hand with the discogenic disease.

(Tr. 22-23)

Dr. Kim was asked to correlate the pathology that was present clinically and objectively to the symptoms that Ms. Weinberg offered and she indicated that the correlation between clinical and objective findings and symptoms were not outside the range of medical probability. (Tr. 27).

Dr. Kim was asked to explain her previous opinions which were provided to Unum.

Dr. Kim was asked to explain her limitation of no sitting greater than one hour and she described that sitting was aggravating Ms. Weinberg's pain symptoms and that was the basis for restricting her sitting.

Counsel specifically asked about the opinions that Unum's physicians raised. Specifically, Dr. Kirsch made comments regarding Ms. Weinberg's motor sensory and deep tendon reflexes. The following exchange occurred between counsel and Dr. Kim:

Q:     Okay. Now Unum hired a physician to go through this case and they hired a gentleman named Dr. Kirsch, Steven Kirsch, and he noted here on physical exam Michele Weinberg's motor sensory and deep tendon reflexes are noted to be normal. Her straight leg raise testing is negative bilaterally. She's noted to have pain with range of motion of the spine. She was noted to have abnormal x-ray and yet she was able from July of 15 yet she was able to continue to perform her occupation.

So I want to make sure I understand this. Does the fact that she had normal sensory and deep tendon reflexes somehow eliminate the back pathology that she had in 15 or the no response that she had to medication and conservative care?

A:     It does not.

Q:     All right. So just to be clear about it, what is motor sensory and deep tendon reflexes? Are they vastly important findings or are they more collateral findings?

A:     They are quite important findings. They are an objective way to measure strength and nerve responses, but they don't, but the type of it does not negate any pain or limitations the patient may have.

Q:     So you think that relying on those findings to the exclusion of objective back pathology, is that reasonable or unreasonable?

A:     I think we need to have, we need to combine the imaging and the patient subjective pain symptoms and the physical exams, but we wouldn't use one measure solely to negate the other factors in a patient's case.

(Tr. 30-32)

Dr. Kim was also asked about whether or not Ms. Weinberg's sparing use of medications caused or contributed to her inability to perform the sitting requirements of her occupation. Dr. Kim stated,

"I don't believe a patient not taking the Percocet caused her to be limited in function. I think her limitations in function is resulting from the original pathology. The Percocet is just a temporizing pain killer and her decision to

use it sparingly was most likely her concerns of side effects and potential
habituation.  Plus the medication itself doesn't eradicate the pain, it just
kind of dulls some of the pain." (Tr. 34)

Likewise, the opinion of Tracy Hamill, Unum's physician consultant, was examined.  Dr.
Hamill never called Dr. Kim and Dr. Kim disagreed with Dr. Hamill's assessment concerning
limitations, especially with the hypothetical ability to transition and change positions during the
day.  Dr. Kim noted,

"Ms. Weinberg also noted pain with transitions after sitting and standing. That
was painful.  And also standing for a protracted period of time was also an
aggravating activity as well.  So she reported difficult siting, standing, or getting
up from sitting, from standing or walking for any appreciable time.  All of those
are aggravating." (Tr. 36-37)

Finally, the opinion of Susan Benson was examined and Dr. Kim disagreed with the
assessment regarding the number of levels where pathology must exist.  The following dialogue
occurred:

Q:        Does there have to be findings on every level?

A:        No.

Q:        And would there have to be findings on every level to have pain?

A:        No.

Q:        Would there have to be findings on every level to have radiculopathy?

A:        No.

Q:        Would there have to be findings on every level that would limit your ability to sit
          or stand or walk?

A:        No.
(Tr. 38)

Finally, the following discussion occurred:

17

Q:      Okay. Doctor, I just want to ask you just a couple of questions now and I think
        we are getting very close to be end here. Based upon your education, training and
        experience as well as your treatment of Michele Weinberg and your review of
        medical records and other documents that I have provided today, do you have an
        opinion within a reasonable degree of medical certainty as to whether or not
        Michele Weinberg could perform the duties of the occupation of residence leasing
        agent as described in the job description or the DOT from November 3, 2016 to
        the current day?

A:      Again it was within - -yes.

Q:      And what is your opinion?

A:      That Ms. Weinberg was unable to perform these duties as described in the
        documents.

Q:      And is your answer within a reasonable degree of medical certainty?

A:      Yes.

Q:      Do you think that Ms. Weinberg will continue to need medical care and therapy
        going into the figure?

A:      Yes.
(Tr. 39)

Clinically, Dr. Kim's assessment of Ms. Weinberg is more accurate in her severity and her pathology and in her clinical exposure than the opinions of Unum's physicians.

In order to get a better understanding of Ms. Weinberg's pathology at the time of her departure from work, we felt it best to obtain a statement from Ms. Weinberg's office manager at Solil Management who worked closely with Ms. Weinberg every day. The statement of Concetta Ferrari-Miletic demonstrates that Ms. Weinberg was having real problems with her physicality in May 2016. She is noted to not have an upright posture and that she was in constant pain and began working at a lower pace and experiencing discomfort. Ms. Weinberg also appeared to struggle when standing from a seated position. Complaints of focus and memory also affected her ability to handle her highly skilled occupation.

These concerns are also evident it he statements of Michele Weinberg and her husband, Stanley Weinberg, who write about the difficulty that Michele had been having with work and

18

how she had been struggling with work and how she had to get up earlier in the mornings to get there on time because she was walking at a much slower pace and was exhausted from fatigue by the time she reached work.

Ms. Weinberg indicates that her pain affects her ability to complete tasks in a timely manner and that her pain was also causing her to make mistakes at work in rent calculations and difficulty managing and updating the vacancy list which is necessary to do several times a day.

Stanley Weinberg makes it very clear that Ms. Weinberg's problems with pain have an ongoing effect on Michele's ability to persist and complete activities in their home.

These statements are very supportive of past clinical severity and demonstrate that Unum's assessment of severity is completely erroneous.

In an effort to continuously establish Ms. Weinberg's entitlement to disability benefits, a full Functional Capacity Evaluation was completed on May 16, 2017. Ms. Weinberg demonstrated a consistent performance and provided maximum reliable effort. The conclusions of the examiner are telling. The examiner concluded that Ms. Weinberg's capabilities were below the demands of her job and of light work and sedentary work as described by the Dictionary of Occupational Titles.

The examiner opined,

> "Ms. Weinberg is unable to perform her previous job of Residential Leasing Agent. Her capabilities are inconsistent with the demands of both light and sedentary occupations.
>
> Ms. Weinberg is still suffering from chronic low back pain and stenosis with radiculopathy into the bilateral lower extremities and all of its complications as well as aggravation of low back pain in the position of forward bending and many other tasks. She tends to move with apprehension so as to not provoke Her symptoms and take frequent rest breaks due to the rapid onset of fatigue. Her general conditioning and musculoskeletal endurance are poor.
>
> Ms. Weinberg is currently unable to function at the sedentary physical demand level due to the high level of dysfunction caused by her frequent episodes of muscle and joint pain and weakness, extreme fatigue coupled with poor musculoskeletal endurance, as well as low back pain and poor spinal alignment. She would not be able to tolerate an 8-hour work day due to inability to sit on more than an occasional basis, similar limitations in standing and walking,

as well as rapid increase of fatigue, deterioration of movements as tasks progress and increased symptoms of pain and dysfunction with many activities."

The physical capabilities that are reported in the FCE, are largely in the occasional bandwidth of experiences. Ms. Weinberg's ability to remain seated is listed as occasional and likewise, Ms. Weinberg's standing tolerance is also limited to occasional. Occasional standing, walking and sitting are not consistent with the full range of sedentary or light occupational demands that are described in the Dictionary of Occupational Titles.

To clarify the vocational aspects of this case, Ms. Weinberg hired vocational expert, Mark Pinti, of Pinti Rehabilitation Management, to review the records and provide an opinion as to whether or not the restrictions and limitations found by Dr. Kim and the FCE would preclude her from working at her occupation, either at a sedentary or a light capacity. Mr. Pinti opined the following:

> "It is my opinion, based on all of the available evidence, that Ms. Weinberg Is not capable of sustained remunerative work activity at any level of exertion. She is limited to much less than sedentary work capability. Her past work as a Residential Leasing Agent is beyond her residual functional capacity."

Attached hereto you will find a copy of the front page of Ms. Weinberg's Notice of Award dated April 16, 2017, which found her disabled under the terms of the Social Security Act as of her departure from work in May 2016.

It is important to note that Ms. Weinberg's standard of disability under Unum's contract is easier to satisfy than the analytical demands posed by the Social Security Act. The Social Security Act requires that Ms. Weinberg be proven to be unable to perform any work in the national economy. Because of Ms. Weinberg's income, she must only prove to Unum that she cannot perform her highly skilled occupation.

At this point, it has become obvious that Unum has underappreciated the severity of Ms. Weinberg's obvious objective pathology and clear clinical presentation. Likewise, the functional capacity evaluation should provide clarity with regard to Ms. Weinberg's present capability which is below standards associated with sedentary or light level work.

Upon reviewing these materials, it should be clear that Ms. Weinberg is entitled to payment of long-term disability benefits. If Unum decides to deny Ms. Weinberg's benefits, a lawsuit will be initiated in the Southern District of New York which will seek Ms. Weinberg's back benefits, pre-judgment interest and attorney's fees. I remain hopeful that that litigation will not be necessary.

20



Very truly yours,

Joseph P. McDonald
McDonald & McDonald Co., L.P.A.

JPM/ksw
Attachments

EXHIBIT 1 -    STATEMENT UNDER OATH OF DR. KIM WITH EXHIBITS

EXHIBIT 2 -    STATEMENT OF CONCETTA FERRARI-MILETIC

EXHIBIT 3 -    STATEMENT OF MICHELE WEINBERG

EXHIBIT 4 -    STATEMENT OF STANLEY WEINBERG

EXHIBIT 5 -    FUNCTIONAL CAPACITY EVALUATION

EXHIBIT 6 -    VOCATIONAL OPINION REPORT

EXHIBIT 7 -    NOTICE OF AWARD – SOCIAL SECURITY